Good morning, ladies and gentlemen. Before we begin, Judge McKeon and I would like to welcome our friend Chief Judge Emeritus Don Molloy from Montana to the panel. Thanks, Don, for taking time out of your busy schedule to help us out here on the 9th. It's an honor to be here. And with that, we will proceed to the first case on the oral argument calendar, which is Udo v. Garland. You may proceed. Good morning, Your Honors, and may it please the Court. David Casarubias, Pro Bono Counsel for the Petitioner, Mr. Peter Donatus Udo. This case is before you because a death warrant has issued threatening public execution against Udo, but the BIA apparently never considered whether this piece of evidence supports a claim for withholding under the Convention Against Torture. In evaluating a claim under the Convention Against Torture, all evidence relevant to the possibility of future torture shall be considered. Here, Udo presented highly probative and potentially dispositive evidence going to his cat claim, including a death warrant threatening the possibility that he will be publicly executed upon his arrival to Nigeria. But that's not all. Udo presented additional relevant evidence to support his cat claim. This includes an affidavit from his mother corroborating the penalties referenced in his death warrant and multiple letters of support that all go to the possibility of future torture, including that if Udo returns to Nigeria, the death penalty and 14 years imprisonment is awaiting him, that Udo was sent away from Nigeria to avoid public execution, that the local vigilante group wants to kill Udo by all means, and that Udo's family does not want him to return to Nigeria because they fear for his safety. Our point on the cat claim is not that this court has to affirmatively decide whether based on the extra testimonial evidence in the record, Udo faces a particularized threat of future torture. Rather, the court only needs to decide whether the agency considered all of this relevant evidence in denying Udo's request for cat release. If the answer is no, then a remand is appropriate. The only evidence in this record of what the agency considered are the IJ's and the BIA's decisions, because the BIA cited matter of Burbano, both are relevant. Turning to the IJ's decision on page 52 of the record, the IJ only references three pieces of evidence in adjudicating Udo's cat claim, his testimony, his declaration, and country conditions evidence. Then, looking at the BIA's decision at page 7 of the record, the BIA adopts the IJ's decision for the reasons stated therein, but then at page 9 of the record, also states that the cat claim is denied based on Udo's own non-credible testimony, even considering country conditions. But what about the tribal council's death warrant suggesting the possibility of a public execution upon his arrival? And what about Justina's affidavit corroborating that death threat? What about his siblings' letters of support doing the same? Those pieces of evidence were never expressly discredited and are highly probative and potentially dispositive of Udo's claim of a possibility of future torture, so they must be considered. Council, what do you make of the credibility determination, which I understand you're not objecting to that, and how does that play out with the lack of consideration of the evidence that you're talking about? That's a great question, Your Honor. The problem in this case is that the agency allowed its adverse credibility determination based on one piece of evidence to infect its decision when it came to analyzing Udo's claim for withholding of removal under the Convention Against Torture. As this court's own precedent firmly states, an adverse credibility determination in the asylum context does not flow to a cat determination. They are mutually exclusive questions, one based on United States law and the other based on international law. And so that adverse credibility determination should not impact the court's review of all the relevant evidence that goes to the possibility of future torture. But that's precisely what happened in this case because the court allowed one misrepresentation of one piece of evidence to allow it to make its frivolousness finding. That leads me directly to my second point. May I just go back on to the cat before you get to the frivolousness? On the cat claim, if I understood the BIA, the BIA said that this gentleman is not gay, and that seemed to underlie the determination that then you wouldn't have torture were he to go back. But what is your response in terms of that perception of the BIA? Your Honor, that characteristic of being gay is not dispositive of the cat question. The cat only concerns itself with the possibility of future torture. A torture does not need to be based on a particularized social group or being gay. It's just any evidence that shows the possibility of future torture, that alone is enough to help someone make a claim for withholding a removal under cat. It does not have to be predicated on being gay. I understand that, but is that a correct characterization given the evidence? Well, the court must consider what evidence was considered, right? Because the BIA is making that decision based only on Udo's testimony and his declaration. But the BIA erred in not looking to the death warrant and the affidavit from his mother and the letters of support, because even if this court completely silos off the incredible testimony, if the court completely puts to one side Udo's declaration, what's left are the death warrant and Udo's family member's letters. And looking at that evidence, there is the potential that the BIA could find a possibility of future torture. The problem here is that the court never looked at that evidence, at least that's apparent from the decision. The reasoning from Cole versus Holder is instructive, where this court stated where there is any A catch-all phrase does not suffice. And here, one would expect the BIA to at least mention the death warrant and say, I don't find this credible, or at least mention the affidavit and the letters and say, I don't think these pieces of evidence are sufficient to show the possibility of future torture. But the BIA never did that. There was some passing reference in the IJ decision, correct? And then the BIA adopts that. So how does that sort out? Well, I would invite the court to reconsider Cole, where in that case, the court noted, you know, there was a passing reference to one of the expert declarations in that case, but that wasn't enough because there wasn't an analysis of probative evidence, potentially dispositive evidence. When the court sees documentary evidence, like what the court has before it today, and there's no reasoned analysis why those pieces of evidence don't show the possibility of future torture, that should be concerning to this court. That should motivate this court for a remand to ensure that the petitioner had an adequate opportunity to present the evidence of the possibility of future torture. Now, on to the frivolousness finding, your honors, our point on that issue is that the court rejected this court's finding precedent in its 2010 decision of Katka v. Holder, which defined materiality for purposes of frivolousness determination. The court instead chose to apply a very generic definition of materiality from a completely different context, and that legal error in and of itself is sufficient for this court to reverse that frivolousness finding. I'll save the remaining of my time for rebuttal. We'll hear from the government. Warning, your honors. May it please the court. Sherry Glazer appearing on behalf of the United States Attorney General. If I could just start by addressing the Cole case that Mr. Udo's counsel focuses a lot of time on. He is correct generally about that case, but the facts of that case are wholly different and distinguishable from the facts of this case with regards to the board's decision. In that case, there was, in fact, evidence. It was plain from the board's decision that the board didn't address particular evidence. So in that case, there were several expert reports, and the board referred to an expert report without saying which one it was referring to and said specifically, analyzing whichever expert report it was looking to, that that expert, quote, was unpersuasive in light of the other evidence, including State Department reports, because the expert failed to give specific examples to corroborate his opinion. And in so stating, again, the board did not clarify which expert report it was referring to, and this court held, well, it's plain from the face of the board's decision that it only addressed one expert report and appeared to not address the remainder of them. And so that was the reasoning for the court's decision in that case. But we don't have anything that's plain from the board's decision here that the board did not consider all the evidence. The board cited this court's case in Stresa and said that the objective evidence, which includes the country conditions report, what Mr. Udo's counsel calls a death warrant, it is actually entitled an excommunication notice, which is why that's what the government refers to it as. That's what it's entitled in the record. And the letters and affidavits that he submitted. So that is all. There's no reason to think that any of that evidence wasn't considered in the board saying that the objective evidence did not show it's more likely than not that Mr. Udo will suffer torture if removed in Nigeria. You know, we have cases, of course, that say you don't have to lay out every piece of evidence, but this excommunication notice really is a centerpiece of the case here. And it's not discussed. It's not really factored in as far as I can see, unless you can point me to somewhere in the decision. Well, I would go back to my original point that I just said, that it is factored in just because it's objective evidence. And no, it wasn't pointed out specifically, and neither were the reports. You know, the board didn't go through an extremely in-depth analysis. It's not required to do so. But it is objective evidence. And if the board hadn't, you know, mentioned any objective evidence like it did in an unpublished decision, it starts with an S. It's quoted in Mr. Udo's reply. It is called Stepayan versus Sessions. That was the situation in that case where the board didn't even say the objective evidence in the case doesn't show it's more likely than not that the individual will suffer torture. The board didn't mention any evidence at all in its conclusion regarding Kat. So the government would argue that that is encompassed in that phrase, the objective evidence. And while the excommunication notice does say that he was caught for being a gay man and is to be publicly executed, I would point this court to page 310 of the record. And page 304, on page 310, there's a report that says no executions have been carried out in Nigeria. And 304 is a State Department report that says with regards to laws that individuals will be executed by stoning, that none of them have ever been enforced and no execution has been carried out. So the board was correct in its conclusion. And the same is true for the remainder of his Kat claim. You know, in addition to that law, there's the Same-Sex Marriage Prohibition Act which punishes individuals for up to 14 years in prison for marrying a same-sex individual or a civil union. But again, the State Department report on 304 makes clear that there were no reports of the government enforcing that. And with regards to the law that an individual is put into prison for 10 to 14 years for engaging in a consensual same-sex relationship, again, page 304 of the State Department report says, quote, in all cases where individuals were detained under that law, that none of them have been charged and they were all released after they paid a bond. So there's no evidence in the record that while these laws do exist, the government can't contest that. There's no evidence in the record that these laws, in fact, have been enforced to show it's more likely than not Mr. Udo will suffer any torture as he claims if he is removed to Nigeria. And with regards to the frivolous finding, if I could move on to that quickly, you know, in this case, you know, when someone like Mr. Udo did perpetuates a very specific story, you know, saying on this specific date, I met my boyfriend at the Sheraton Hotel. It was not the first time I had met him there. We ordered food. A waiter came into the room and caught us in an intimate moment and very specifically keeps perpetuating that after that happened, hotel security came. They arrested both of us. They detained both of us for three hours. And in those three hours, at some point, my community vigilante group was called, who came to get me, that these details, the where, the what, the why, these are the details that have a natural tendency to influence a decision maker. And they were material aspects of his claim. It wasn't just, you know, this mere detail of location. It was very, very specific details. And with regards to his reliance on CADCA, you know, in CADCA, the discussion regarding fabrication of material evidence versus fabrication of a material element, the only reason that came up is because an objective piece of evidence, a newspaper article there, was fabricated. It was never part of the paper that was published, that was circulated publicly. We don't have that. So what's the principal distinction to be drawn between documentary evidence and testimonial evidence? Well. It certainly wasn't limited in CADCA. I guess that was the government's position that the only reason that discussion came up because there was a piece of documentary objective evidence that was fabricated. And the same is true with LTM. But even if this court says, well, you know, the agency should have applied the standard in CADCA that it's a material, a fabrication of a material element, if it's a part of a claim that has to be proven in order for the claim to succeed, the government would argue that this case falls into that as well. Again, you know, Mr. Udo's claim is all based, everything that he specifically said happened at the hotel. That's really sort of the predicate for the rest of his claim. And we don't have any evidence whatsoever in the case saying that these specific events that he says now happened at the vicinity did happen there. We don't have any testimony. We don't have any evidence. We don't have anything. What we do have is if you look at the letter from his mother and the affidavit from his at pages 392, 407, and if you take into account the excommunication notice on 384, those are the only pieces of evidence we have that discuss anything at a hotel. And all that can be gleaned from those pieces of evidence is that he was in fact caught for being a gay man at vicinity on April 16, 2015. But then that still leaves a gaping hole in his claim regarding, you know, the hotel security coming to arrest him, detaining him for three hours, and calling his community vigilante group. The government contends this would be a completely different case if he said that he was caught at a hotel on April 16, 2015, and then at some point later his community vigilante group came to find him. But that's not what he said. He very specifically kept perpetuating the story of what happened to him, the specific details of the Sheraton. And in fact, Your Honors, he kept perpetuating the story until and even after DHS counsel presented this evidence saying, well, that's impossible. The Sheraton didn't even exist on this date. It wasn't even supposed to be completed until over a year later. And in the light of our – what really seems to be ignored here is this excommunication notice. So it's – I find it hard to reconcile the – I.J.'s finding that he failed to establish that he is gay. Yeah, so – I mean, that's – it's just like colliding with the evidence that I'm reading. So I'm trying to – and then, of course, the BIA adopts that. So that seems to be sort of a false premise underlying the I.J.'s analysis. Well, I'm glad you brought that up, because in my brief I didn't defend that as part of the frivolous findings. It's the government's position that, yes, the I.J. absolutely said on page 65 that Mr. Udo did not establish that he was gay. The I.J. didn't ever say, I don't believe Mr. Udo is gay. And, you know, in situations like this, when you have a lot of evidence that's mixed with non-credible evidence, it's difficult – I don't know. They said Udo failed to establish that he is gay. That's pretty clear. Yes, that is what the I.J. said. But if you look at the start of that paragraph, I would point you to the start of it, and that's really what's integral for this frivolous finding, because the I.J. says, Mr. Udo admitted his claim that he was caught having sexual relations with his boyfriend at the Sheraton was false, and that misrepresentation was the material one, and that was the essence of his claim. And the board, you know, really when the board affirmed the frivolous finding, it didn't add any reasoning of its own, but I would point the court to page 4 in the adverse credibility section of its decision. And the board says that he deliberately misrepresented the location of his alleged persecution and testified that a central aspect of his claim occurred at the Sheraton. So it's the government's position that, you know, yes, the I.J. said that he did not establish that he was gay, but that's not what was the basis for the frivolous finding that, you know, that the court should look at it as just the location of where he was shouldn't play into the reasoning behind the frivolous finding, because that was, you know, a statement that the I.J. said, but it's really based on what he said happened at the Sheraton, not that he didn't establish that he was gay. What difference does it make if it was the Sheraton or some other hotel three blocks down the road or four blocks down the road? That isn't, he wasn't asking to be granted relief in this country because he was at a Sheraton hotel. It's because of the allegations that he was engaged in inappropriate sexual conduct in his country at a hotel. Now, he did give the wrong name, but does that mean it didn't happen? Well, it's the government's view that the details that he said happened, now he claims they happened at the vicinity again, the arrest, the detention, the calling of the vigilante group, that there absolutely, there is no evidence that that happened. He seems to kind of insinuate that that's somewhere in the record, but it's not. And I would point the court to page 185 after, you know, there were four continuances and then another hearing happened in November 2017, I believe it was, and his new counsel asked questions that led him to say, well, I, you know, I said the Sheraton, but I was just using it as a point of reference. And then on page 185, his counsel asks him, so are you now saying that everything that happened at the Sheraton happened at the vicinity? And DHS counsel immediately objected and said, no, you can't reopen this entire case, all the testimony for him to now say all of these things happened at the vicinity. We don't have any evidence whatsoever in this record saying that he was arrested, detained for three hours, and his vigilante group was now, that all happened at the vicinity. So, yes, there is still a gaping hole, and this location is extremely important to this case. Thank you, counsel. We'll hear rebuttal. Thank you. Thank you, your honors. A few points on rebuttal. First, I disagree with the government. I think, as your honors have aptly noted, the death warrant, which is titled an excommunication notice, is the linchpin of this case. And it does corroborate the letters of support and Justina's affidavit that Mr. Udo was caught engaging in a homosexual act and then was sentenced to death. And the government says this record is devoid of any facts, but it is not. There are facts in this record that support a possibility of future torture. Another point that the government now makes is that, or they highlight the multiple proceedings in this case. But I just want to go back because the multiple continuances were given to allow Mr. Udo to provide an explanation for the name discrepancy of the hotel. However, had he been put on notice that the government didn't consider him to be gay, then he would have been using those continuances to corroborate the fact that he's gay. But he didn't have to do that because the only fact at issue in those continuances was the name of the hotel, which, as our visiting Judge Molloy just noted, who cares? The name of the hotel is not a material element of an asylum claim. Your honors, we ask that the court grant Udo's petition, reverse the frivolous misfinding, and remand for a full and fair consideration of his cat claim. Thank you. Thank you both for your arguments this morning. The case just argued be submitted for decision.
judges: THOMAS, McKEOWN, Molloy